The second case, 25-1717 Eastern Missouri, Yitzchak Simon v. Tishaura Jones et al. Thank you, Ms. Duncan. Good morning. May it please the Court? My name is Abby Duncan. I represent the former Mayor Tishaura Jones and the former Director of Human Services, Yusuf Scoggins, in this matter. The District Court got it wrong when it decided that qualified immunity and official immunity did not apply to Mayor Jones and the former Director of Human Services. You've got to speak up. You've got to focus and articulate better for me. Okay. Will do, Judge. The District Court got it wrong when it denied qualified and official immunity to the former Mayor and the former Director of Human Services on plaintiff's claims of First Amendment retaliation, due process violation under the Fifth and Fourteenth Amendment, and the State claim of tortious interference of a business relationship. And thus, this Court should reverse on those points. First, the District Court erred in denying qualified immunity to defendants on the plaintiff's First Amendment retaliation claim, where the facts, when viewed most favorably in light of the plaintiff, demonstrate that the plaintiff did not engage in protected activity and that the defendants did not retaliate against plaintiff under clearly established law for exercising such rights. Counsel, that may be true, but the District Court found that there were genuine issues of material facts about what Simons said and what his statements were at the encampment. So how do we have jurisdiction? How do we get around the fact that the District Court said there are disputed material facts here? The District Court failed to analyze this point of whether or not Simon himself, the plaintiff himself, alleges that he participated in protected activity. They completely failed to acknowledge that argument at all. And when looking solely at the plaintiff's claim of what he said he did at the encampment, it doesn't reach a constitutional threshold, as he must do when bringing a First Amendment retaliation claim. Well, he certainly pled enough to suggest that the mayor believed that he engaged in expressive activity, right? Well, whether or not he pled it is irrelevant to the question of a motion for summary judgment and whether he can prove for it. What the defendants perceived, I see, is critical. It is critical. To the issue of qualified... That's what Judge Render just addressed. He alleged that the mayor thought he was told he was doing the same things again. And his prior protests were clearly, at least in part, protected activity. So the prior protest occurred several weeks prior. And in the record, there's no indication that the mayor or Scoggin knew that such a protest took place. They don't have to allege that kind of constant business. Well, they have to allege that there was a First Amendment... They allege that what happened at the camp at this time was because he was perceived to be doing the same damn thing he was doing before. Well, what he was perceived to be doing and what he says he did are different, but taking what the plaintiff...  Either one, it seems to me, suffices on this question. Well, under what he says he was doing is that he was saying hello, asking people what happened, and doing a lot of standing around. Standing around stuff. Forget that. That's just... That is the worst kind of protectual argument on this issue. It's not protectual. It's what he says he did. And when we're looking at the facts in the light most favorable to the plaintiff... And they also say he's been protesting all the time? No. There's only evidence in the record that he was out there several weeks prior and that no one knew that he was out there or that a protest even took place. So, according to what he says he did, he was just out there standing around. Now, what the defendants knew of what he was doing is relevant only to the extent that it informs under the Qualified Immunity Analysis what the defendants knew, what was reported to them, and the actions that they took. In this case, it is undisputed what the mayor knew. She was informed by her staff that an SBC employee, St. Patrick's Center employee, who she later learned was the plaintiff, was telling unhoused people that they didn't have to leave as city outreach workers were offering them places for shelter. It's undisputed that the city was trying to close this encampment and working with nonprofit partners, including St. Patrick's Center, to offer services to the homeless before the encampment closed. And so, understandably, under those facts, Mayor Jones made a phone call to the CEO of St. Patrick's Center informing her of what he had learned from those on the ground. So, it is undisputed what he says he did. The mayor has no reason to dispute that. She was not personally at the encampment. She is only going off of what other people told her. And qualified immunity analyzes only those facts of what facts were knowable to the defendant and whether, based on those facts, their actions were reasonable under the circumstances. And here they were. So, counsel, we don't normally second-guess a district court's determination that there are genuine disputes of material fact. Can we do so if there is nothing in the record to support a genuine dispute? Could you rephrase your question? I'm sorry. We don't normally second-guess a district court when they conclude that there is a genuine issue of material fact. But what if there is nothing in the record to support such a dispute? Can we do so then? Well, if there is nothing to support what the district court has ruled, then yes, this court can make a decision that is contrary to that. And in this case, essentially what we're arguing is that the district court ignored entirely what plaintiffs said that they did, viewing the facts in the light most favorable to the plaintiff, completely ignored that, and said, well, defendants knew something differently, so there must be a dispute of fact. And that's simply not true. And if the district court had done what they were supposed to do, which is to look at the facts in the light most favorable to the plaintiff, they would have realized that that constitutional threshold is not even met based on the plaintiff's own statements. In addition to there being no protected activity, there's no adverse action taken by the plaintiffs against plaintiff. Plaintiff complains of being fired. The defendants did not fire the plaintiff, nor did they induce St. Patrick's Center to fire the plaintiff. It is undisputed in this case that there were three people on the phone call that the mayor made to the CEO of St. Patrick's Center. The first was the mayor. The second was the mayor's director of operations, and the third was the CEO of St. Patrick's Center. All three of these individuals testified under oath that there was never any allegation, any mention, or any reference to funding in that phone call. Everything else that the plaintiff points to, some letter in the plaintiff's employment file, what the CEO may have told plaintiff's supervisor, all of that is simply hearsay and speculation. The only three people who were on that phone call all have testified that such a threat was never made. And to the extent that plaintiff alleges otherwise, it is merely speculation. And to that point, then, there is no admissible...  Right. Direct testimony that... You know, we're back again for the umpteenth time this week to, well, he said, she said, so either there can be or there can't be summary judgment or qualified immunity. And our case law is far more nuanced than anyone gives credit to. That may be true, Judge. But on this record, there is no admissible evidence that such a threat was made. And that's what they hang their hat on. They say such a threat was made and therefore... Well, the stream of events provides some corroboration. It doesn't. It's all hearsay and speculation. There's a letter in the plaintiff's personnel file that said... The timing of the firing, right after the phone call. Right, but that... And right after everybody's talked to the St. Patrick people. Right. Well, no one's arguing that that didn't play some part, that what the city reported to St. Patrick's Center didn't at all play a role in the firing. The question is... Counsel, wouldn't you agree that reasonable inferences must be made in favor of the plaintiff? If someone calls up someone's boss and complains about them and then they get fired, isn't it a reasonable inference that there may have been an implied threat? No, because there could be numerous reasons for why that was absent in a threat. It could be, and the CEO of St. Patrick's Center testified, that any time he gets a complaint from someone who is a donor, he gets concerned that funding may be pulled. That that's just something, as a CEO, that he thinks about. So, it's entirely possible that he may have inferred that danger. But whether or not those statements were actually made is their case. And there's absolutely no admissible evidence that it was so. Defendant's actions of calling a plaintiff's employer to complain of plaintiff's unprofessional and disrespectful behavior as they understood it, from reports to them, is not clearly established adverse action under the First Amendment. What is not? What is not clearly established adverse action?  That a mayor or a Department of Human Services calling someone's employer to complain about their unprofessional and disrespectful behavior. There's nothing in the record to suggest that. It depends on whether they just expressed disappointment. We don't want to deal with this guy anymore. Pull him. So, the only admissible evidence in the record is that the mayor called the St. Patrick's Center CEO and said that she was disappointed in this employee. That's it. For the mayor to do that, the ex-mayor, is pretty extraordinary. Unless the inference that there was a method to the madness is what the plaintiffs allege. Well, in fact, there's no inference that such a threat was made to the plaintiff's employment. In fact, it's just the opposite. In the record on page 80, the record shows that the mayor's staff specifically called the CEO and told him after this incident with phone calls back and forth not to fire the plaintiff. So, if anything, there's admissible evidence in the record saying that that was not the goal. That was not the goal that the mayor or that Scoggin wanted to achieve. Secondly, the district court erred in denying qualified immunity to defendants on plaintiffs' Fifth and Fourteenth Amendment due process claims. We mentioned this in our brief, that the Fifth Amendment pertains to the actions of the federal government and federal actors, so really the only thing that would apply here would be the Fourteenth Amendment. The reason why that's important is because while the Fifth Amendment cases may put federal actors on notice of what actions may be permissible and impermissible, the Fifth Amendment cases would not put a state or local actor on notice of what would be permissible. In this case, the district court and the plaintiffs hearken back to Fifth Amendment cases, and that would not be proper here. There's no Fourteenth Amendment case guaranteeing a right to a specific job. We point this court to persuasive... Well, you're in very troubled waters that are not appropriate for summary disposition. Well, it's a legal issue. Well, it's certainly not the clearly established prong of qualified immunity. There's nothing clearly established about what you just said. And where the law is not clearly established, qualified immunity is warranted. Pardon? Where the law is not clearly established, qualified immunity is warranted. So if it's this court position that the law is not clearly established on this point, whether the Fifth Amendment and the Fourteenth Amendment guarantees a right to a specific job, then qualified immunity is warranted in this case. The plaintiff points to no Fourteenth Amendment case guaranteeing a right to a specific job, but even in Fifth Amendment context, the right to a specific job is only upheld when there's some kind of regulatory authority involved. Both in Chernin and Hovey and Waddle, the regulatory authority that the government enacted was such that if they were to withhold that or enact that regulatory authority, then that business would essentially go bust. And in this case, there's simply no evidence that such regulatory authority with St. Patrick's Center exists. At most, there's evidence in the record that the city has some part in funding, but exactly to what extent is unclear. And also, there are many other avenues of funding that are addressed in the record. And finally, to this point of the state law claim of tortious interference in a business relationship, just very quickly, the district court erred in not granting official immunity. Official immunity, especially the malice prong of that, has kind of gone through a game change with the Missouri Supreme Court's holding in Ludwig Cunningham, where they specified that the malice exception is an intent to injure the plaintiff. And here, where the mayor does not know the plaintiff, had no interaction with him, and where there's no evidence that Scoggin had any malice toward the plaintiff, official immunity should be granted. And thus, I ask that the court reverse the lower court on these points. Thank you. Ms. Barth? Good morning. Good morning. I'm Brandy Barth for the appellee, Mr. Simon. I wanted to start with whether or not there's a factual dispute about whether or not the mayor threatened the funding of St. Patrick's Center, which led to the termination of Mr. Simon. Council brought up a fact that they brought up in their memorandum that the director of operations made a second phone call saying, hey, by the way, we don't want you to terminate Mr. Simon over what we've told you. It reminded me of the courtroom drama, A Few Good Men, Why the Second Order, right? So if you hadn't threatened his employment, if the phone calls hadn't threatened the employment, when the mayor called, why the second phone call to say, oh, by the way, we're not saying that you terminate him. Now, number one, Mr. D'Agostino, who's the CEO or was the CEO of St. Patrick's Center, he has no recollection of the second phone call, number one. So that's a disputed fact in and of itself. But then secondly, for council to propose that there's no evidence that there was a threat of funding made, it's just belied by the record. They try to coin the termination letter as hearsay. Well, this is a business record. In employment law, termination letters very often follow a termination. But it is unusual to see the reason so specifically outlined in a termination letter. And this is a business record of some – We've been urging that for as long as I've been a judge. Right, yeah. If you don't make it clear. Right, but in this case, we have clear evidence of the reason. We have to call his or her first witness. Right. But in this, we have a document from the St. Patrick's Center, and it is in the record at 537. So you can read that whole letter for yourself. It says your termination is a result of our funding being threatened by the city. And that is a big deal for St. Patrick's Center. And I would also point to our record at 512. The uncontroverted evidence from St. Patrick's Center is they have a budget of $20 million. Two-thirds of that comes from government funding. Of that two-thirds, almost all of it comes from the city and is determined how to be dispersed. And that's in our factual allegations in the record at 512. So for them to act as if we have no control over St. Patrick's Center, well, of course, every charitable entity relies upon funding. Otherwise, you can't provide the charitable services. You can't employ the people that they were employed. The mayor knew that. The mayor didn't know Mr. D'Agostino, who is the CEO of St. Patrick's Center, much like she didn't know Mr. Simon. She made the phone call for a very specific purpose because she did not like what Mr. Simon was doing down at the Riverfront Encampment. And Mr. Simon was known to the city. If you look in the record again at page 680, 681, 682, Mr. Simon, leading up to the Riverfront Encampment, had been at protest on the steps of City Hall, had been photographed. He had been photographed bringing supplies and materials. That was on KSDK that night. He was a known entity. So his presence down there on the day of the eviction caused a problem for the city. They did not want him there. They didn't want him there providing supplies. They didn't want him there just being there talking to people. But not only that, they didn't like it. Let me maybe hone in just a little bit.  I think it's a more foundational question about whether there was even any First Amendment activity taking place. What evidence is there in the record that would form the basis for the conclusion by the district court that there's a genuine dispute, a fact, about what Mr. Simon said or did at the encampment that could be considered First Amendment activity? As I understand it, the record just says, I'm standing around, I'm shooting the breeze. I don't see any allegations of First Amendment activity. So, first of all, I think his presence alone can be First Amendment activity. The fact that you are there and you are a known person who disagrees with what the city is doing. Is that his job to interact with the homeless and provide services? When he is on duty, he is. He was actually on his day off that day. And, in fact, the first two phone calls he received from his boss said, hey, you're on your day off and you can do whatever you want to do. Okay, so he shows up on his day off, stands around, shoots the breeze. How is that First Amendment activity? And so that is part of what Mr. Simon testified. Mr. Simon also testified that he was saying, you don't have to go. But the difference is, what he was saying is, I didn't do a lot. You imagine a whole day that you're, I mean, this eviction took a whole day. So there was a lot of standing around. These are people that he knows. He's been providing services to them for years. There was a lot of sitting around and talking. Is there any evidence in the record that he criticized the mayor or the city or their policies or procedures or was advocating verbally for the homeless? Certainly. In anything? And it is a bit of a continuum as well because they want to separate it. But the first eviction started on March 10th, and that's when the protests began against the eviction that Mr. Simon was part of. He, again, was interviewed by the news. The mayor testified that she watches the news and reads the papers every day. He was interviewed by the news. He was photographed on the steps of City Hall with protest signs saying, and those are those three pages that I gave you, 680, 681, and 682. And then he happened to have the day off on the day that the evictions were rescheduled. And so because he was not employed that day, he was not working as a representative of St. Patrick's Center, they said, well, you can do what you want on the day off, as long as you're not saying I'm here on behalf of St. Patrick's Center. But these are people that he had relationships with. Obviously, the city was taking pictures of him. There's two pictures that St. Patrick's – I'm sorry, that city employees took of him the day of. And so – and there was active protest going on at the riverfront that day. And so what he said was, I didn't try to stop the homeless people from taking services, which is what was then eventually told to his boss, right? His dispute was, no, I didn't do that. I was giving them information that you don't have to do the things they're saying for you to do. He had a disagreement, along with everyone else at St. Patrick's, with the information that the city was providing to the unhoused population there, that the services they were telling them was going to get them out of the trouble. It didn't follow the guidelines that they had been working with for years. So, yes, Mr. Simon was down there providing a presence and information if he had – if he wanted to. My point is that First Amendment retaliation claims only apply to retaliation for First Amendment activity, not for other things. Sure, and he participated in First Amendment activity on March 10th, and that's the photograph I talked to you about when he was actually on the steps of city hall holding a protest sign. He protested in the news and media. And then he was there that day as a form of protest to provide alternate information if the people wanted to. But he was not – but he disagrees with which what – so it is interesting because we have the city saying he's doing all of this stuff, which would be free speech if he was doing what they claim he was doing. He disagrees with the interpretation that the city gave about what he was doing down there. To him, he was there as a presence to be helpful, provide supplies, give them better information. But he would never say, oh, the city has a bed for you and a treatment facility. Don't do it. You should stay down here and live at the encampment, which is the way that the city was trying to twist it to his boss. Well, I thought that the reason that the district court gave for concluding that there was a dispute of material fact was because there was a dispute over what he said and did at the encampment that day, not some other time. No, the city does – I'm sorry. The court did also point to his other protest activities as a person who was known to speak out about that issue. So you can't take his activities. I don't think it's fair to take them in a vacuum. He was a very well-known opponent of how the city was doing these evictions. There was email traffic going on between March 10th and March 22nd, the day of the rescheduled, where St. Patrick's Center is complaining about what the city is doing, how they hadn't involved them, they hadn't talked to them. So you can't really take just what happened that day. You have to take all of his First Amendment activities leading up to that as well. He just disagrees. What he says is, no, I wasn't down there flipping people off. You can look at the picture. He was flashing peace signs, but they interpreted it as flipping off. I wasn't calling people names. I wouldn't do that. But I was down there to provide an alternative opinion if they needed help. And that's what he does for the gun house. He brings water. He helps them figure out where, you know, one of the things he said, I was trying to help them figure out what to do with their belongings. And so for them to, I don't think it's, I'm trying to think of the word. I just don't think it's a reasonable interpretation to say that what he was doing was not First Amendment-protected speech because this had become a huge issue. It's hard to look back in time and remember it. But we were talking multiple news stories. Cameras were down there. You know, TV news stories, print news stories were going on. This eviction was a very, very hotbed political action. Counsel, would you agree that there is a distinction between the city being upset with someone because they are a vendor interfering with the delivery of services under a city program, on the one hand, versus being upset with someone because of their speech? Not really because if you disagree with the city's program and you're speaking out about that, that is free speech. And he was well-known disagreeing with the city with the way that they were conducting their program. Because if his employer was being paid money by the city to deliver services and if they felt he was interfering with that, that might be very different than if they were upset about criticizing the mayor. So the city, and I think the city is in charge of dispersing funds. They're not, the city doesn't pay them directly for the service. There's funds that come through the federal government, other types of, and it kind of goes into a pool, and they get to then determine how to disperse this. They're called partners. It's not that St. Patrick's Center works for them. But I don't think, I think any type of disagreement, any citizen, whether or not you work for a charitable organization or not, you have the ability to disagree with the city, their policies, the way that they are conducting them, carrying them out. And Mr. Simon, that's what Mr. Simon was doing. He was very much against this eviction of the riverfront encampment. Agree or disagree with Simon, that's one thing. And the mayor could disagree with him. They could ask them to leave. They could say, hey, we don't agree with what you're saying here. But then to take it the extra step and say, I disagree with what you're doing so much that I'm going to call your boss, and by the way, look what I can do, it worked. Because they were so unhappy with what he was doing down there. Maybe that's a due process claim rather than a First Amendment retaliation claim. But the due process claim itself, the whole reason they're depriving him of his job, because they're unhappy with his disagreement with what they're doing with the unhoused population. So I think you have to have them both. Because the whole reason that they made the decision to go after his job was because they didn't like what he was saying and doing. They didn't like that he was protesting against them. They didn't like that they were making this eviction in their minds more difficult than they thought it should have been. They thought they were going to go in, get it done fast. And Mr. Simon was a leading advocate that the first eviction canceled in the first place because there was such an outroar over it. And so this isn't some sort of small issue that was going on in the city. We're talking that the Board of Aldermen were involved, that the media was involved. This was a huge deal that was going on. And the only reason Mr. Simon is no longer working there is because city officials didn't like him being down there because they knew that he disagreed with them. And they took it upon themselves to punish him for doing what they called interfering with them. Are there any other questions, Your Honors? Yeah, I think your whole argument is far weaker as to Scoggin. I don't understand why Scoggin doesn't deserve qualified immunity. So Scoggin, even though Scoggin didn't have the ultimate authority to threaten the funding, he made the first two phone calls. He's the one who, from the testimony, made the decision to involve the mayor. That, hey, I've already made these phone calls. I'm getting no traction. I need the mayor to get involved. And again, if it wasn't about Mr. Simon's employment, why call his boss? Why not direct their comments directly to Mr. Simon at the time? Mr. Scoggins also chose to involve Mr. Simon's boss. And I think that's why he doesn't deserve qualified immunity either. So what? Well, the so what is, if you don't agree with a citizen, if you're a city official and you don't agree with someone's speech or activities or protests that they're involved in, you can't use that authority to then call their boss. This is Justice Scalia's famous opinion that I can't remember the name of, that you're just another example of plaintiffs trying to use First Amendment retaliation to get around that decision. And that's consistently failed in this circuit. I'm amazed nobody briefed that aspect of it. Well, I'm sorry, Your Honor. I don't know that case. But I don't. I don't. Whether you're punished for something you did while performing work as opposed to a citizen speaking out of a matter of public concern. There's no dispute here that the day that this was happening, he was not on duty. Yes, well, that was the start of the evasion. Yeah. My time is done. I'm not sure that means, that makes irrelevant all of the principles and authorities behind interpreting that case. Which would include some of the, you know, so he made a call to the boss. But he was calling as a city official. He wasn't calling as Joe Blow-Off-the-Street. He was calling because he was a city official and he was trying to get this person in trouble. City officials who are defendants in those cases. Yeah. My time has expired, Your Honor. Thank you so much this morning. Very good. Thank you. The case has been, well, thoroughly briefed and the argument's been helpful and we'll take it under advisement. I think there's some more. Pardon? May I reply with my 40 seconds left? Oh, yes. Go on. I'm sorry. Sure. I didn't see the light soon enough. Oh, sorry. I'll be very brief. I want to direct the court to the record at 346. D'Agostino has asked, did anyone make a threat to you that St. Patrick's Center could lose funding because of what Mr. Simon did? Answer, no one told me that. Plaintiff seems to allege here an argument that the mere presence at the riverfront would be indicative of First Amendment activity. In response to that, I would point this court to the Molina case in footnote 2, where Molina was arguing that they were standing around watching police officers, and the Molina court asked, what is that expressive of? Expressive of what? And that's the same thing here. What is the mere presence of him? It was also my case out of Pine Bluff, which is a fleet in which just standing around was sufficient for the case to move on. I'm unfamiliar with that case currently, Judge, but in Molina, the question was – What's your response, though, because they argued that essentially he was a known protester anyway. Yeah, so one, there's no evidence in the record that he attended any other protests except the one a few weeks prior to the encampment closure. And on that point, the mayor is unfamiliar with him. Scogin is unfamiliar with his protesting activity. So there has to be some link between his, quote, known activity and the animus that they claim that the defendants had. And there is none. If they don't know that he was out there protesting against them, if they don't know that they were making these arguments against the mayor or their homelessness activity, then what could be the animus for their action? You mentioned Agostino. He's the St. Patrick's person? He's the CEO. And did anyone ask him how, if the statement you just made that no threats were made, how did the letter reflect just the opposite? He said he didn't know. The problem with the letter is that no one knows who wrote it, no one knows what information they're drawing from, no one knows what this alleged threat was or how it came about or who made it. That's why it's inadmissible here. It is a business record, but what it says in the letter is hearsay, and that's why it's not admissible, and that's the problem with it. It's also a problem with what Goosen said that the CEO made to her. You can assert it's not admissible, but we'll see. But they have to show that at this stage. They have to show that there would be admissible evidence at trial. Otherwise, we go all the way to trial. What case says that? That you have to establish at the qualified immunity stage that you will win the evidentiary issue. I would point this court to Henke v. Global Van Lines. What is it? Henke v. Global Van Lines. Is it in your briefs? It is. We have a whole string cite. There's Pink Supply Corporation v. Hebert, Financial Times Publications v. Compute Graphic Corp. I don't see it in your table of authorities. It may be on reply. I don't see it in either one. I apologize, Judge. They are cited in there. I don't have it in front of me. If you throw in a string cite and don't put them in your table of authorities. They should be there, Judge. Except oral argument. It's happened before. Now I need a 28-J with that case. I will get that to you, Judge. Unless there are any other questions, we ask that the district court's judgment be reversed. Thank you.